**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE SWERVEPAY ACQUISITION, LLC | ) ) ) | Consolidated C.A. No. 2021-0447-KSJM |

**MEMORANDUM OPINION**

Date Submitted: April 14, 2022
Date Decided: August 26, 2022

Peter J. Walsh, Jr., Nicholas D. Mozal, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Orion Armon, COOLEY LLP, Denver, Colorado; Luke Cadigan, COOLEY LLP, Boston, Massachusetts; Alexandra Leeper, COOLEY LLP, Palo Alto, California; Katelyn Kang, COOLEY LLP, New York, New York; *Counsel for SPOSC Investment Holdings, LLC*.

Peter J. Walsh, Jr., Nicholas D. Mozal, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Bradley Levison, Carrie A. Herschman, HERSCHMAN LEVISON HOBFALL PLLC, Chicago, Illinois; *Counsel for Jaeme Adams, Katrina Adams, and Christopher Hamilton*.

A. Thompson Bayliss, Stephen C. Childs, ABRAMS & BAYLISS LLP, Wilmington, Delaware; David B. Hennes, Adam M. Harris, Alexander B. Simkin, ROPES & GRAY LLP, New York, New York; Sarah M. Samaha, ROPES & GRAY LLP, Washington, District of Columbia; *Counsel for SwervePay Holdings LLC, OSC Investment, L.P., OSC Investment GP, LLC, OSC Payments, Inc., SwervePay LLC, Blue Star Innovation Partners GP, LLC, New Mountain Capital, LLC, Robert Wechsler, Michael Oshinsky, and Matthew Dubbioso*.

**McCORMICK, C.**

New Mountain Capital, LLC ("New Mountain") acquired SwervePay, LLC ("SwervePay") to provide payment processing services to another New Mountain subsidiary. The purchase agreement included an upfront payment of $10 million, as well as earnout payments worth up to $55 million in cash and anywhere from $150 million to $500 million in equity payable only if SwervePay achieved contractual milestones.

When it became clear mid-way through the earnout period that SwervePay would not achieve any of the contractual milestones, the sellers sued the buyers. The gravamen of the sellers' complaint is that, in negotiations leading up to the purchase agreement, the buyers overstated a key financial metric—monetizable payment volume. Monetizable payment volume refers to the portion of overall payment volume flowing through the buyers' existing system that was available for conversion to the sellers' electronic payment platform. According to the sellers, the buyers represented that the monetizable payment volume flowing through the buyers' system was at least $34 billion and potentially as high as $50 billion. Based on those figures, the sellers would need to convert roughly 13% of the buyers' monetizable payment volume to achieve the first milestone and receive the attendant payments. In reality, the buyers' monetizable payment volume was approximately $5 to $6 billion. Based on these figures, the sellers would need to convert roughly 43% of the buyers' monetizable payment volume to achieve the first milestone and receive the attendant payments.

The sellers brought claims against the buyers for fraudulent inducement, conspiracy to commit fraud, and breach of contract. The sellers also asserted claims against the buyers for fraudulently inducing certain key employees into executing employment agreements.

The buyers responded by filing a separate lawsuit, claiming that the sellers induced the buyers into acquiring SwervePay through fraudulent representations related to SwervePay's features, functions, and customer pipeline. The buyers also claim that the sellers breached the purchase agreement based on alleged material adverse changes in the business relationship with material customers.

The court consolidated the sellers' and buyers' suits, although the operative complaints remain separate. For simplicity, this decision refers to the seller parties as "Sellers" and their complaint as the "Seller Complaint." This decision refers to the buyer parties as "Buyers" and their complaints as the "Buyer Complaint."

The Buyers moved to dismiss the Seller Complaint for failure to state a claim. Certain Buyers moved to dismiss for a lack of personal jurisdiction. The Sellers moved to dismiss the Buyer Complaint for failure to state a claim. This decision first addresses the motion to dismiss the Seller Complaint and then addresses the motion to dismiss the Buyer Complaint.

In what amounts to a glorified pruning exercise, both motions are granted in part. Sellers' fraud claims against New Mountain and certain of Buyers' fraud and contract claims survive. The remaining claims and defendants are dismissed.

## I. FACTUAL BACKGROUND TO THE MOTION TO DISMISS THE SELLER COMPLAINT

The facts are drawn from the Seller Complaint and documents it incorporates by reference.[1]

### A. The Players

New Mountain acquired non-party Ontario Systems, LLC ("Ontario") in August 2019 by purchasing a majority stake in OSC Investment, L.P. ("OSC Holdings"), which wholly owns Ontario. Ontario licenses financial services software to clients in healthcare and government. Under this business model, Ontario derives its revenue from licensing its proprietary software. When New Mountain acquired Ontario, Ontario was contracting with third parties to provide payment processing services.

New Mountain partnered with Defendant Blue Star Innovation Partners GP, LLC ("Blue Star") and non-party Eir Partners to transform Ontario's business model. Blue Star was an "industry leader in the payment facilitator sphere," and Blue Star's role in the group was to provide analysis and strategy recommendations.[2] The group determined that Ontario's value could be improved by partnering with a payment facilitator instead of using third-party vendors.

SwervePay (formerly known as SwervePay Acquisition, LLC) offers payment processing services and solutions for merchants processing online payments from customers. Payment facilitators like SwervePay derive revenue by charging as a fee a

---

[1] C.A. No. 2021-0447-KSJM, Docket ("Dkt.") 1, Verified Compl. ("Seller Compl.").

[2] Seller Compl. ¶¶ 23, 41, 50.

small percentage of each payment processed through the system. Accordingly, SwervePay's revenue depends on the volume of payments made to its clients that are processed through its payment processing system.

Rounding out the list of players, the three individuals named as plaintiffs in the Seller Complaint are SwervePay's (pre-acquisition): Chief Executive Officer, Jaeme Adams; SwervePay's Executive Vice President of Technology and Chief Technical Officer, Christopher Hamilton; and Director of Operations, Katrina Adams. Jaeme Adams is mentioned more than Katrina Adams in this decision, and so this decision refers to him as "Adams." Under the Purchase Agreement (defined below), "Seller" refers to SwervePay. For convenience only, as noted above, this decision defines "Sellers" as the plaintiffs to the Seller Complaint: SPOSC Investment Holdings, LLC (which was known as "SwervePay" pre-acquisition), Adams, Hamilton, and Katrina Adams.

The three individuals named as defendants to the Seller Complaint are: Vice President of New Mountain, Michael Oshinsky; a director at New Mountain and an "officer and/or director" of two of the acquisition vehicles, Matthew Dubbioso; and Chief Executive Officer of Blue Star, Robert Wechsler.

Also, New Mountain formed acquisition vehicles to complete the transaction, including SwervePay Holdings, LLC ("SwervePay Holdings") as a wholly owned subsidiary of OSC Payments, Inc. ("OSC Parent").[3] Under the Purchase Agreement

---

[3] Seller Compl., Ex. 24 at 9 (explaining that "SwervePay, LLC forms a new Delaware limited liability company, SwervePay Acquisition, LLC [SwervePay Acquisition]").

4

(defined below), "Buyer" refers to SwervePay Holdings. For convenience only, this decision includes New Mountain, Blue Star, SwervePay Holdings, OSC Parent, and the other entities and individuals named as defendants in the Seller Complaint in the defined term "Buyers."[4]

## B. The Purchase Agreement And Earnout Payment Structure

In October 2019, New Mountain identified SwervePay as an acquisition target and sought to incorporate its payment facilitation platform into Ontario's software systems.[5] On February 24, 2020, Sellers and New Mountain entered into a Membership Interest Purchase Agreement (the "Purchase Agreement").

The Purchase Agreement called for an upfront payment to Sellers of $10 million and 100 Class A Units of OSC Holdings. Also, if SwervePay achieved contractually specified milestones between January 1, 2021 and December 31, 2021 (the "Earnout Period"), the Purchase Agreement entitled Sellers to earnout payments of up to $55 million in cash and additional equity units in OSC Holdings projected to be worth anywhere from $150 million to $500 million.

If SwervePay generated $17.5 million in revenue during the Earnout Period from converting Ontario's existing payment volume (the "First Milestone"), the Sellers would receive up to $43.75 million (the "First Milestone Payment"). If SwervePay generated $10

---

[4] The defendants include New Mountain, Blue Star, SwervePay Holdings, OSC Holdings, OSC Parent, OSC Investment GP, LLC (which is OSC Parent's General Partner), SwervePay Acquisition, Matthew Dubbioso, Michael Oshinsky, and Robert Wechsler.

[5] Seller Compl. ¶ 7.

million in new revenue during the Earnout Period (the "Second Milestone"), the Sellers would receive up to $25 million (the "Second Milestone Payment"). If SwervePay achieved either the First Milestone or Second Milestone, the Sellers would also receive 10,000 "Earnout Parent Shares," which could be exchanged immediately for an equal value of shares in OSC Holdings.[6]

### C. Representations To Sellers Regarding Payment Volume

The parties' dispute centers on the First Milestone Payment, which itself turns on Ontario's existing payment volume.

In negotiations between leading to the Purchase Agreement, Buyers made statements that the volume of payments flowing through Ontario's software was "between $40–$50 billion."[7] Specifically, during an October 29, 2019 meeting between Sellers and Blue Star, Matthew Steffe of Blue Star represented to Adams that "Ontario's payment volume was between $40–[$]50 billion annually, and further represented that this $40–$50 billion reflected payment volume that would be available for conversion."[8] This representation was repeated on a December 9, 2019 call with representatives from New Mountain and Blue Star, including Wechsler.[9]

Meanwhile, in December 2019, John Durrett of Blue Star was gathering data from Ontario concerning payment volume. During negotiations of New Mountain's acquisition

---

[6] *Id.* ¶ 81.

[7] *Id.* ¶¶ 8, 43, 44, 52.

[8] *Id.* ¶ 43.

[9] *Id.* ¶ 44.

of Ontario, Ontario represented to New Mountain that it had around $34 billion in potentially monetizable payment volume. In December 2019, Durrett specifically inquired into the basis of Ontario's 2018 $34 billion estimation. In response, Ontario provided Durrett with a 2018 memo reflecting that the number was based on market assumptions and not Ontario's actual customer base. Durrett identified problems with the assumptions-based approach. For example, the estimate included student loan debt, which must be processed by government-approved vendors, and which Ontario was not. By December 17, 2019, Durrett concluded that Ontario's $34 billion estimate was "based on industry benchmarks for volume/seat at 10X" and that Blue Star "[r]eally need[ed] to dig into customer data to figure out gap."[10] After further analysis, Durrett concluded that Ontario had only $5 billion of monetizable consumer payments. These conclusions are reflected in notations to a shared Google Sheets document.

Sellers allege on information and belief that Durrett's $5 million calculation was shared with Buyers, and that is reasonable to infer. At the time, Durrett's role at Blue Star, and Blue Star's role generally, was to analyze and provide strategic recommendations to New Mountain on how to best partner with Ontario and a payment facilitation business. Payment volume was a key driver of this analysis and thus a key aspect of the strategic recommendations. It is reasonable to infer, therefore, that Durrett shared his calculations with Buyers.

---

[10] *Id.* ¶ 48.

Despite Durrett's $5 billion calculation, Oshinsky represented that monetizable payment volume was $40–$50 billion at a January 31, 2020 meeting with Sellers.

On February 4, 2020, Adams and Hamilton emailed Oshinsky and Wechsler requesting more information on the monetizable payment volume figure. On February 6, Oshinsky responded by sending the "October Month Detail" for sample Ontario customers. Oshinsky represented to Adams and SwervePay CTO and Executive Vice President of Technology Christopher Hamilton that these numbers excluded the "vast majority of payment volumes that the platform directs" and that the "total payment volume running through our workflow on a monthly basis is multiples of these numbers."[11]

Adams responded on February 7, stating

> To clarify what we're trying to assess: In conversations thus far, we've come to understand that ~$1B in payments have been monetized by Ontario and that there is an additional $40B-$50B that have not. We're trying to get the clearest picture possible of where that volume exists by platform/segment and how that may or may not impact the ability for us to move it quickly to the [SwervePay platform].[12]

Dubbioso responded by email stating "we'll revert with answers on these items."[13] Wechsler followed up by text stating: "can't wait any longer," "the [payment] volume will get done and we have everything we need," and "If you aren't comfortable let's just move

---

[11] *Id.* ¶ 54.

[12] Dkt. 2, Ex. 17 at 1–2.

[13] *Id.* at 1.

on. I have too much time invested here and have to win. So if we aren't going to close – I need to proceed elsewhere." [14]

On February 8, Oshinsky emailed Sellers an attachment containing a "definitive accounting of Ontario's $34 billion monetizable payment volume" (the "February 8 email").[15] The "definitive accounting" reproduced the same calculations and numerical assumptions that were sent to Durrett in December, which had Durrett had viewed skeptically. Further, the information Oshinsky sent to Sellers did not contain any of the explanatory notes included in the December email to Durrett on the bases for the assumptions, and it also did not contain any of the questions or explanatory notes Durrett subsequently prepared challenging those assumptions.

The $34 million number was reported to the SwervePay board of directors pre-acquisition. Minutes of the February 12, 2020 board meeting report Adams stating that SwervePay would only need to "capture a relatively small piece of the $34,000,000,000 in payments that is estimated to run through Ontario" in order to achieve the earnout payments being contemplated.[16]

With a monetizable payment volume at $34 billion, SwervePay would achieve the First Milestone by converting 13% of Ontario's payment volume during the Earnout Period. By contrast, with a monetizable payment volume of $5 to $6 billion, SwervePay

---

[14] Dkt. 2, Ex. 18 at 1–2.

[15] Seller Compl. ¶ 60.

[16] Dkt. 2, Ex. 20 at 6.

9

would need to convert 47% of Ontario's payment volume to achieve the First Milestone. Sellers viewed the 47% as impossible to achieve.

### D. The Key Employee Agreements

The Buyers sought to retain key SwervePay employees post-acquisition: Adams, Hamilton, and Katrina Adams (collectively, the "Key Employees"). Ensuring that the Key Employees remained with SwervePay "was important to executing on [Buyers'] plan to convert Ontario into a payment facilitator" generally.[17] Hamilton in particular was viewed as "critical to the acquisition" because he wrote a majority of SwervePay's code and was the "sole source of understanding for much of the company's technical footprint."[18]

In an effort to induce the Key Employees to execute their respective Employment Agreements, Buyers awarded Adams and Hamilton 7,250 Class P Units (valued at over $2 million) and 7,250 Profits Interest Units ("PIUs") each.[19] Approximately 40% of the PIUs vested upon meeting performance targets, and the target case valuation for the PIUs awarded to Adams and Hamilton was over $4 million.[20] The target case valuation of the PIUs, however, was based on the $34 billion monetizable payment volume figure, while the PIUs only had a strike price equal to Ontario's valuation at closing. This meant that Adams and Hamilton would only receive value to the extent that Ontario's valuation increased after closing. Based on a $5 to $6 billion in monetizable payment volume figure,

---

[17] Seller Compl. ¶ 72.

[18] *Id.* ¶ 73.

[19] *Id.* ¶¶ 74, 77, 80.

[20] *Id.* ¶¶ 74, 75.

the increase to Ontario's valuation would be "negligible."[21]  Sellers contend that the PIUs were rendered "close to worthless" when the monetizable payment volume was reduced from $34 billion to $5 to $6 billion.[22]

In addition, each of the three Key Employees was a unitholder of SwervePay.  As a result, the Key Employees "expected to be paid at the end of the earnout period" if they achieved the relevant milestones.[23]  Since this payment hinged on the represented monetizable payment volume of $34 billion, Sellers contend that Buyers used this expected payment to induce the Key Employees to enter their respective Employment Agreements.

### E.  The BillingTree Contract

Prior to entering the Purchase Agreement, Buyers failed to disclose that Ontario was a party to an agreement with BillingTree, a SwervePay competitor.  Under the BillingTree agreement, BillingTree held a right of first refusal for any Ontario customer until December 21, 2020.  BillingTree was able to "persuade a number of key customer accounts to migrate to its platform on longer-term contracts" before expiration of its right of first refusal.[24]

Section 4.04(c) of the Purchase Agreement contained a representation that Ontario was not a party to any contract that would "impair or delay [Ontario's] ability to consummate the transactions contemplated by" the Purchase Agreement.[25]  Sellers claim

---

[21] *Id.* ¶ 76.

[22] *Id.*

[23] *Id.* ¶ 79.

[24] *Id.* ¶ 98.

[25] *Id.* ¶ 97.

11

that the BillingTree contract harmed SwervePay's ability to convert Ontario's customers and achieve the milestones because BillingTree was able to sign up Ontario customers to long-term contracts leading up to the Earnout Period.

### F.    Sellers Fail To Achieve Earnout Payments Post-Acquisition.

According to Sellers, post-acquisition, Buyers interfered with the Key Employees' efforts to meet the milestones by shifting the focus away from payments and to transforming the business model.  This shift in strategy resulted in the termination of key support personnel, scattered former SwervePay employees to different areas within Ontario, and placed new responsibilities on Adams and Hamilton in addition to their existing duties.[26]  Despite these hindrances, SwervePay converted roughly "22–25%" of Ontario's payment volume by May 2021, five months into the twelve-month Earnout Period.[27]

### G.    The Seller Complaint

The Sellers filed the Seller Complaint on May 21, 2021.

- In Count I, Sellers claim that Buyers fraudulently induced Sellers to enter into the Purchase Agreement.

- In Count II, Sellers claim that Buyers conspired to commit fraud related to the Purchase Agreement.

- In Count III, Sellers claim that SwervePay Holdings and New Mountain breached the Purchase Agreement by failing to disclose Ontario's prior agreement with BillingTree.

---

[26] *Id.* ¶ 86.

[27] *Id.* ¶ 85.

- In Counts IV through VI, the Key Employees claim that Buyers fraudulently induced them to sign the Employment Agreements.

- In Counts VII and VIII, the Key Employees seek declaratory judgment that the restrictive covenants found in the Purchase Agreement and Employment Agreements are unenforceable because they were founded upon fraud.

Buyers moved to dismiss all counts of the Seller Complaint under Court of Chancery Rules 12(b)(6) and 12(b)(2). The motion was fully briefed, and the court heard oral argument on April 14, 2022.[28]

## II. LEGAL ANALYSIS OF BUYERS' MOTION TO DISMISS THE SELLER COMPLAINT

This analysis proceeds in two parts. The court first addresses the motion to dismiss for failure to state a claim pursuant to Court of Chancery Rule 12(b)(6). Those Rule 12(b)(6) arguments are directed to, in the order addressed: Counts I and VI through VIII asserted various theories of fraud (the "Fraud Claims"); Count III for breach of contract (the "Breach of Contract Claim"); and Count II for civil conspiracy (the "Civil Conspiracy Claim"). The court last addresses the personal jurisdiction arguments.

### A. Failure To State A Claim

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[29] On a Rule 12(b)(6) motion, the court accepts "all well-pleaded factual allegations in the Complaint as true, [and] accept[s] even vague allegations

---

[28] Dkt. 33, Defs.' Opening Br. ("Buyers' Opening Br."); Dkt. 39, Pls.' Answering Br. ("Sellers' Answering Br."); Dkt. 47, Defs.' Reply Br. ("Buyers' Reply Br."); Dkt. 72, Oral Arg. Tr.

[29] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[30]

The court "is not, however, required to accept as true conclusory allegations without specific supporting factual allegations."[31] The court draws "all reasonable inferences in favor of the plaintiff, and den[ies] the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[32]

### 1. The Fraud Claims

"Under Delaware law, the elements of fraudulent inducement and fraud are the same."[33] To state a claim for fraudulent inducement or fraud, a plaintiff must allege:

> (1) that a defendant made a false representation, usually one of fact; (2) with the knowledge or belief that the representation was false, or with reckless indifference to the truth; (3) with an intent to induce the plaintiff to act or refrain from acting; (4) that plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of her reliance on the representation.[34]

---

[30] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[31] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (internal quotation marks omitted).

[32] *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor*, 812 A.2d at 896–97).

[33] *Great Hill Equity P'rs IV, LP v. Sig Growth Equity Fund I, LLLP*, 2018 WL 631182, at *31 (Del. Ch. Dec. 3, 2018).

[34] *Grunstein v. Silva*, 2009 WL 4698541, at *12 (Del. Ch. Dec. 8, 2009) (citing *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992)); *accord Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *see also Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2021 WL 1592473, at *7 n.79 (Del. Ch. Apr. 23, 2021) (holding that "[t]he elements of fraud and fraudulent inducement are the same").

Sellers claim that Buyers fraudulently induced them into signing the Purchase Agreement and Employment Agreements by stating that Ontario's monetizable payment volume was $34 billion.

Buyers advance three arguments for dismissal of the Fraud Claims. They contend that Sellers failed to allege a false statement with particularity, failed to adequately allege reliance, and used impermissible group pleading to attribute the statements made in the February 8 email to all Buyers.

### a.     Particularity

The primary basis of the Fraud Claims is the February 8 email. Buyers argue that it failed to meet the particularity requirements of Rule 9(b).

Under Rule 9(b), "the circumstances that must be stated with particularity are the time, place, and contents of the false representation, the identity of the person(s) making the representation, and what he intended to obtain thereby."[35]

In the February 8 email, New Mountain's Oshinsky represented that "Ontario Payment Volumes" was $34 billion, when Buyers knew that the monetizable payment volume was far lower than $34 billion.[36] The February 8 email replied to Adams's February 7 email that stated, "[t]o clarify what we're trying to assess: In conversations thus far, we've come to understand that ~$1B in payments have been monetized by Ontario

---

[35] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003) (citations omitted).

[36] *See* Buyers' Opening Br. at 20–26.

15

and that there is an additional $40B-$50B that have not."[37]  In response, the February 8

email stated: "Circling back on your ask to help calibrate payments volumes, attached is

the math I was alluding to.  The build here is to about $34B."[38]  Oshinsky then attached a

spreadsheet entitled "Ontario Payments Volumes."[39]

Buyers do not argue that these allegations fall short of most of the particularity

requirements.  Sellers clearly plead the time (February 8), place (email), and contents ($34

billion) of the statement, the identity of the person who made it (Oshinsky), and what he

intended to obtain (agreement to enter into the Purchase Agreement).  Instead, Buyers

argue that the February 8 email is not false because the $34 billion figure "represented

Ontario's *total* 'payments volumes,'" not monetizable payment volume.[40]  Buyers contend

that Sellers cannot rely on the surrounding context in which the statements were made to

argue fraud.  According to Buyers, the statements in the February 8 email should be

considered alone in deciding falsity.[41]

Buyers' argument does not work for a few reasons.  For starters, the key word "total"

does not appear in the February 8 email.  Buyers ask the court to infer it.  Moreover, the

context suggests that the payments volume information was provided in response to queries

regarding monetizable payments volume.  The particularity requirement does not serve as

---

[37] Dkt. 2, Ex. 17 at 1.

[38] Dkt. 2, Ex. 19 at 1.

[39] *Id.* at 3.

[40] Buyers' Opening Br. at 22–23 (emphasis in original).

[41] Buyers' Reply Br. at 9–11.

a requirement that the court make a defendant-friendly inference as to falsity from particularized facts. Nor does it require the court to ignore the context of allegedly false statements.[42]

Buyers cite to a decision of the Delaware Court of Common Pleas, *Patel v. Shree Ji, LLC*, to support their contention that the court must ignore context in deciding whether a statement is false.[43] In *Patel*, the buyer of a liquor store alleged that the store had "dead inventory" contrary to the seller's representation that the store had no "dead inventory" at the time of the sale. At trial, the buyer testified that he viewed "dead inventory" as inventory that did not sell in the six months following the sale of the store. In a post-trial decision, the court held that the buyer's testimony was not enough to establish the meaning of the term "dead inventory." Accordingly, the court could not hold that the seller's representation regarding dead inventory was false.[44] The court observed that the buyer "should have offered expert testimony on the meaning of 'dead inventory.'"[45]

Buyers argue that *Patel* stands for the proposition that the context of an allegedly fraudulent statement cannot supplant the actual statement and that the subjective understanding of a party does not control the fraud analysis. *Patel*, however, was decided post-trial; a plaintiff's burden is necessarily lower at the pleading stage. Moreover, unlike

---

[42] *See NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 32 (Del. Ch. 2009) (holding that the reliance element was satisfied when the speaker made false disclosures about its intent "in a context where" the speaker expected the listener "to review and rely on them").

[43] 2013 WL 5715434, at *5 (Del. Com. Pl. Oct. 18, 2013).

[44] *Id.*

[45] *Id.*

*Patel*, there is no ambiguity in this case as to how "total" or "monetizable" payment volume should be defined; rather, there is a factual dispute as to whether the $34 billion figure meant one or the other. *Patel* does not aid Buyers' argument.

Sellers have adequately alleged the falsity element of the Fraud Claims with particularity, and Buyers' motion to dismiss on this basis is denied.

### b.      Justifiable Reliance

Buyers argue that Sellers fail to adequately allege reliance on the February 8 email.

"Making a false statement is not a strict liability offense."[46]  To plead a claim of fraud, the defendant must have had "the intent to induce the plaintiff to act or refrain from acting," and the plaintiff must in fact have acted or not acted "in justifiable reliance on the representation."[47]  As both parties observe, whether reliance was justifiable or reasonable is a fact-intensive inquiry that is not well-suited for resolution at the pleading stage.[48]

Buyers argue that Sellers' pre-acquisition board minutes confirm that Sellers did not rely on Oshinsky's February 8 representation of payment volume.  The board minutes in question state the following: "[Adams] noted that if [SwervePay] could capture a relatively

---

[46] *NACCO*, 997 A.2d at 29.

[47] *Id.* (quoting *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003); *see also* Restatement (Second) of Torts § 525 ("One who fraudulently makes a representation . . . for the purpose of inducing another to act or refrain from action . . . is subject to liability to the other . . . caused to him by his justifiable reliance upon the misrepresentation.").

[48] *See NACCO*, 997 A.2d at 32 (stating that "the line when [plaintiff's] reliance became unreasonable is difficult to draw and is not something I will address on a motion to dismiss"); *Flowshare, LLC v. GeoResults, Inc.*, 2018 WL 3599810, at \*4 (Del. Super. July 25, 2018) (noting that "whether a party's reliance was reasonable is not generally suitable for resolution on a motion to dismiss").

small piece of the $34,000,000,000 in payments that is estimated to run through Ontario, [SwervePay] should be able to reach the Ontario portion of the earnout."[49]  Buyers hone in on the word "estimated" and repeat their arguments concerning "total" payment volume, arguing that Sellers cannot demonstrate reliance because "[Sellers] understood the $34 billion figure to be an *estimate* representative of Ontario's *total* payment volume."[50]

Buyers' arguments again fail in light of Sellers' pleading obligation.  At the pleading stage, it is reasonable to infer from the portion of the board minutes not quoted by Buyers that the board considered the $34 billion figure to be an accurate assessment of Ontario's monetizable ("available for capture") payment volume.  The word "estimated," standing alone, does not undermine that inference.  And the absence of the word "monetizable" does not mean that the board believed the figure to be "total" payments volume.

Sellers have adequately alleged the justifiable reliance element of the Fraud Claims, and Buyers' motion to dismiss on this basis is denied.

### c.     Impermissible Group Pleading

Buyers argue that the Fraud Claims must be dismissed as to Blue Star, Dubbioso, Wechsler, SwervePay Holdings, SwervePay Acquisition, OSC Holdings, OSC Investment, and OSC Payments—i.e., all Buyers except Oshinsky and New Mountain—because those defendants are not alleged to have sent the February 8 email.[51]

---

[49] Dkt. 2, Ex. 20 at 6.

[50] Buyers' Opening Br. at 35 (emphasis in original).

[51] Buyers' Opening Br. at 30–34.

In order to state a claim for fraud, the first element requires that a false statement be made by the defendant; only "[t]he speaker who makes a false representation is, of course, accountable for it."[52] "A plaintiff must adequately plead a . . . claim 'against each individual director or officer; so-called 'group pleading' will not suffice.'"[53] Although group pleading is not prohibited under Delaware law, it "is generally disfavored."[54]

Oshinsky is New Mountain's Vice President and was engaged in negotiations on behalf of New Mountain; his February 8 email, therefore, can be viewed as a statement by New Mountain for pleading purposes.[55] Sellers do not argue otherwise. The question is whether it is fair to impute Oshinsky's statement to Buyers other than himself and New Mountain.

That question is easily answered as to SwervePay Holdings and SwervePay Acquisition, which were not in existence at the time of the February 8 email; they were created when the Purchase Agreement was executed later that month.[56] Oshinsky's February 8 email therefore cannot support a fraud claim against them.

[52] *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 59 (Del. Ch. 2015).

[53] *Genworth Fin., Inc. Consol. Deriv. Litig.*, 2021 WL 4452338, at *22 (Del. Ch. Sept. 29, 2021) (quoting *Raj & Sonal Abhyanker Fam. Tr. v. Blake*, 2021 WL 2477025, at *4 (Del. Ch. June 17, 2021)).

[54] *In re WeWork Litig.*, 2020 WL 7343021, at *11 (Del. Ch. Dec. 14, 2020); *see also River Valley Ingredients, LLC v. Am. Proteins, Inc.*, 2021 WL 598539, at *3 (Del. Super. Feb. 4, 2021) (interpreting the Superior Court analogue to Court of Chancery Rule 9 and concluding that "[t]here is nothing in Rule 9 that *per se* prohibits group pleading").

[55] Seller Compl. ¶ 24.

[56] *See id.* ¶ 71 (stating that "Though [SwervePay Holdings] and [SwervePay, LLC] are formally parties to the MIPA, [SwervePay Holdings] and [SwervePay, LLC] were only

Sellers argue that Oshinsky's February 8 email supports a claim of fraud against Wechsler and Dubbioso based on statements by Wechsler and Dubbioso made elsewhere. Sellers maintain that Weschler "spoke" regarding Ontario's payment volume when he texted Adams that "the [payment] volume will get done"[57] and that Dubbioso did the same when he replied to Adams that New Mountain would "revert with answers on these items."[58] In isolation, these statements do not support a claim of fraud. Nor do they support a claim of fraud in combination with the February 8 email. On their face, these statements did not—expressly or impliedly—endorse, repeat, or affirm any aspect of the allegedly false statement. Sellers do not meaningfully argue otherwise.

Rather, Sellers primarily argue that the statements by Weschler and Dubbioso constituted an attempt to conceal the fraudulent nature of the $34 billion figure. That position, too, requires an untenable stretch. Under Delaware law, fraudulent concealment requires a "show[ing] that a defendant took some action affirmative in nature designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry."[59]

---

created by and for the MIPA, and did not exist when the fraudulent misrepresentations and/or omissions were being made by the Defendants").

[57] Sellers' Answering Br. at 28.

[58] *Id.* at 29.

[59] *Transdigm Inc. v. Alcoa Glob. Fasteners, Inc.*, 2013 WL 2326881, at *6 (Del. Ch. May 29, 2013) (quoting *Metro Commc'ns Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 150 (Del. Ch. 2004)).

21

Sellers contend that Weschler's threats to "proceed elsewhere" if the parties were unable to close was an attempt to "prevent [Seller] Plaintiffs from prying further and from uncovering the true payment volume." In addition, Sellers allege Dubbioso's promise that New Mountain would provide answers to Adams's questions was an affirmative step "designed to prevent Plaintiffs from uncovering the true monetizable payment volume."[60]

Neither of these arguments are convincing. Wechsler's assurances that the payment volume figure would "get done" and Dubbioso's assurance that Adams's questions would get answers do not demonstrate an attempt to conceal information; rather, they indicate that information would be forthcoming. The statements by Wechsler and Dubbioso fail to rise to the level of concealment, as such statements cannot be viewed as attempting to prevent adverse facts from coming to light.

Tacitly acknowledging the weakness in their primary argument, Sellers further contend that Wechsler and Dubbioso "had a duty to correct the material misstatement made by Oshinsky in the February 8 email" by virtue of being copied on the email and their roles in the negotiations generally.[61] As support, Sellers point to *Corporate Property Associates 14 Inc. v. CHR Holding Corp.*[62] There, the court held that a corporation committed fraud by omitting information about a large planned dividend when responding to a questionnaire sent by a party seeking to value outstanding warrants.[63] In *CHR Holding*, the fraudulent

---

[60] Sellers' Answering Br. at 31.

[61] *Id.* at 27.

[62] 2008 WL 963048 (Del. Ch. Apr. 10, 2008).

[63] *Id.* at *2, *7.

act and attendant "duty to speak" concerned the same actor and statement—a corporation's impartial response to the questionnaire.[64] By contrast, the fraudulent act in this case was the February 8 email stating the payment volume. Wechsler's statement that the payment volume figure would "get done" and Dubbioso's statement that answers would be forthcoming were ancillary to the alleged misrepresentation by Oshinsky. They did not give rise to a duty to speak.

Sellers' efforts to rope in Wechsler and Dubbioso to the Fraud Claims, therefore, fail.

Regarding Blue Star, the only basis Sellers offer for imputing the February 8 email is Wechsler's affiliation with Blue Star.[65] Since none of Sellers' arguments above stick in attributing the February 8 email to Weschler, Sellers have similarly failed to sufficiently establish that Blue Star made the statement to satisfy the first element of fraudulent inducement.

Sellers make no other meaningful efforts to extend Oshinshy's February 8 email to the other Buyers. Sellers correctly note that they "at times refer to multiple Defendants in a single allegation" and that "grouping defendants together when alleging actions is not group pleading."[66] But that supplies no reason in law or logic to impute the statements in the February 8 email to other defendants. They further note, correctly, that "Delaware law

---

[64] *Id.* at *7.

[65] Seller Compl. ¶¶ 26, 101, 103.

[66] Sellers' Answering Br. at 18.

does not expressly forbid [group pleading]."[67]  But they fail to explain why group pleading should be permitted here.

For these reasons, Buyers' motion to dismiss the Fraud Claims in Counts I and IV through VIII as to Blue Star, SwervePay Holdings, OSC Holdings, OSC Investment, OSC Payments, SwervePay Acquisition, Dubbioso, and Wechsler is granted.

### 2.      The Breach Of Contract Claim

"Under Delaware law, plaintiffs must allege the following three elements to succeed on a breach of contract claim: (1) the existence of a contract, whether express or implied; (2) breach of one or more of the contract's obligations; and (3) damages resulting from the breach."[68]

"When interpreting a contract, the role of a court is to effectuate the parties' intent."[69]  "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[70]  Absent ambiguity, "Delaware courts interpret contract terms according to their

---

[67] *Id.*

[68] *GEICO Gen. Ins. Co. v. Green*, 276 A.3d 462, 2022 WL 1052195, at *5 (Del. Apr. 8, 2022) (TABLE) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

[69] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[70] *City Inv. Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) (italics in original) (citation omitted).

24

plain, ordinary meaning."[71] The "contract's construction should be that which would be understood by an objective, reasonable third party."[72]

Sellers claim that SwervePay Holdings and New Mountain breached Section 4.04(c) of the Purchase Agreement by intentionally failing to disclose Ontario's prior arrangement with BillingTree.

Buyers move to dismiss the breach of contract claim in Count III because Section 4.04(c) applies to agreements to which SwervePay Holdings is a party, and SwervePay Holdings is not a party to the BillingTree agreement.[73]

Section 4.04(c) of the Purchase Agreement states:

> Noncontravention. The authorization, execution, delivery and performance of this Agreement and the other Transaction Documents to which [SwervePay Holdings] is a party will not, the consummation of the transactions contemplated hereby or thereby will not and compliance by [SwervePay Holdings] with the terms hereof and thereof will not . . . (c) violate, contravene or conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under or result in or give rise to a right of termination, cancellation or acceleration of any obligation, or require any action by (including any authorization, consent or approval) or notice to any Person, or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any Person under, *any contract to which [SwervePay Holdings] is a party* or by which its assets are bound, except, in the case of clause (c), where the violation, contravention, conflict, breach, default, termination, acceleration right or loss would not, individually or in the

---

[71] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[72] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (internal quotation marks omitted).

[73] Buyers' Opening Br. at 41.

aggregate, materially impair or delay Buyer's ability to consummate the transactions contemplated by this Agreement and the Transaction Documents to which [SwervePay Holdings] is a party.[74]

Section 4.04(c), a standard contractual noncontravention provision, only applies to "contract[s] to which [SwervePay Holdings] is a party."[75] New Mountain is the counterparty to the BillingTree agreement, and SwervePay Holdings is not a party to the BillingTree agreement.[76] Sellers concede this point in the Seller Complaint.[77] Since SwervePay Holdings was not a party to the BillingTree agreement, that agreement is not prohibited by the plain language of Section 4.04(c).

Sellers do not dispute that their claim for breach fails under the plain language of Section 4.04(c). Sellers instead argue that the provision *should* have been written to include New Mountain because "[SwervePay Holdings] was created for the sole purpose of facilitating the [Purchase Agreement]."[78] But that is not what happened. When determining the legal sufficiency of a claim for breach of contract, the court is stuck with the language the parties agreed to. Under that language, Sellers fail to state a claim for breach.

---

[74] Dkt. 1, Ex. 1 ("Purchase Agreement") at 47 (emphasis added).

[75] *Id.*

[76] Buyers' Opening Br. at 41.

[77] *See* Seller Compl. ¶ 96 ("Ontario had entered into an agreement with BillingTree in December 2017.") (citing Dkt. 2, Ex. 34); *see also* Dkt. 2, Ex. 34 at 1, 7 (noting that the agreement was between Ontario and BillingTree and evidencing that the agreement was signed only by representatives from Ontario and BillingTree).

[78] Sellers' Answering Br. at 43.

Buyers' motion to dismiss Count III for failure to state a claim is granted.

### 3.    The Civil Conspiracy Claim

"The elements for civil conspiracy under Delaware law are: (1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage."[79]

In Count II, Sellers allege that Buyers worked in concert to fraudulently induce Sellers into entering into the Purchase Agreement. Specifically, Sellers argue that Buyers "were each the agent, servant, partner, and/or joint venturer of the other" and that there was a "close interrelationships between all [Buyers]."[80] Sellers' theory is that Buyers worked together to acquire SwervePay on "illusory earnout terms that Defendants knew were not achievable."[81]

Buyers advance two arguments for dismissal of the conspiracy claim.

Buyers first argue that there was no wrongful act to satisfy the second element because Sellers fail to adequately allege fraud.[82] This decision has already rejected that argument.

---

[79] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n.8 (Del. 2005) (citing *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987)).

[80] Seller Compl. ¶¶ 103–04.

[81] *Id.* ¶ 105.

[82] Buyers' Opening Br. at 39.

Buyers next argue that the Seller Complaint fails to satisfy the first element of a confederation or combination of two or more persons because the Seller Complaint contains only "wholly conclusory allegations."[83]

A plaintiff pursuing a civil conspiracy claim must "establish facts suggesting 'knowing participation' among the conspiring partners," which can be accomplished by showing "a meeting of the minds on the object or course of action."[84] Although Rule 9(b) requires a fraud claim to be pled with particularity, "[t]he existence of a confederation may be pled by inference [and] is not subject to the specificity requirement of Rule 9(b)."[85]

This decision has already held that the Sellers fail to support a claim for fraud against Buyers other than New Mountain and Oshinsky. The question is whether the same facts support a claim for civil conspiracy. Sellers argue that all Buyers participated in the conspiracy to defraud Sellers either (i) by participating in the negotiations of and communications about the Purchase Agreement (including through designated agents and when false statements were made), (ii) by signing the Purchase Agreement and associated agreements, and (iii) by virtue of being an entity created by New Mountain to accomplish the SwervePay acquisition.

---

[83] *Id.* at 37.

[84] *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *11 (Del. Ch. Apr. 29, 2010).

[85] *Agspring Holdco, LLC v. NGP X US Hldgs., L.P.*, 2020 WL 4355555, at *21 (Del. Ch. July 30, 2020) (quoting *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *20 (Del. Ch. Nov. 26, 2014)).

In essence, Sellers allege that all Buyers, their agents, and their advisors should be treated as a single conspiratorial group based solely on their joint efforts to consummate this deal. The discrete acts Sellers cite in their complaint amount to mere participation at deal meetings, being copied on emails containing the allegedly fraudulent statements, and communicating with the parties to the transaction. Taken to its logical extremes, Sellers' argument invites this court to find grounds for conspiracy in virtually any negotiation that involves multiple parties partnering to execute a deal. While there certainly may be circumstances in which concerted efforts rise to the level of conspiracy, Sellers' threadbare contentions do not allege more than ordinary partnership in deal negotiations.

Sellers rely on *LVI Group Investments, LLC v. NCM Group Holdings, LLC*, where the court denied a motion to dismiss a claim for civil conspiracy among negotiating parties.[86] There, the buyer alleged that the seller and its affiliates intentionally inflated the target. The court found that the plaintiff adequately alleged a claim for fraud against the target entity and a claim for civil conspiracy against the affiliated defendants—the target's parent entity, officers, and managers. The court held that the complaint pled "in abundant detail" that defendants had worked with the target to manipulate the financial statements before and during the merger negotiations.[87] The court further observed that "the Individual Defendants, as principals of the private equity firm that held most of NCM's

---

[86] 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2018).
[87] *Id.*

29

equity, had an obvious incentive to make the company's financials appear stronger than they actually were."[88]

In this case, Sellers argue that Buyers also "had an obvious incentive" to make the deal appear attractive like in *LVI*. But such common incentives standing alone cannot support a claim for civil conspiracy. If that were enough, then every deal participant who worked together with another would be exposed to liability since there is an inherent incentive to make an acquisition appealing. The law requires that a plaintiff allege an unlawful act in furtherance of the conspiracy. In *LVI*, the court was able to infer a conspiracy based on the fact that each defendant had some level of responsibility for preparing the financials at the center of the fraud. Sellers do not allege any similar unlawful acts here.

Sellers also point to two other decisions of this court to support the inference that Buyers acted in concert with one another. The first is *Agspring Holdco, LLC v. NGP X US Holdings, L.P.*,[89] and the second is *Ogus v. SportTechie, Inc.*[90] While both cases found that defendants acted in concert to satisfy the first element of a civil conspiracy claim, both cases involved multiple substantial acts by individuals involved in the conspiracy. In *Agspring*, the defendants provided feedback to improve financial statements, encouraged employees to "add back amounts to EBITDA calculations," and advised employees to

---

[88] *Id.*

[89] 2020 WL 4355555 (Del. Ch. July 30, 2020).

[90] 2020 WL 502996 (Del. Ch. Jan. 31, 2020).

modify financial documents to make the company "look more attractive to potential investors."[91] In *SportTechie*, the defendants converted the corporation into an LLC, thereby eliminating the founder's veto right and allowing the board to terminate the founder. The defendants then created a new board that excluded the founder, procured a shareholders agreement providing for the repurchase of the founder's shares upon his termination, terminated the founder, and then repurchased the shares at an unfair price.[92]

The allegations that the Buyers engaged in civil conspiracy are far thinner than both *Agspring* and *SportTechie*. In this case, there is nothing more than a reasonable inference that a group of people collaborated to close a deal. That, standing alone, does not support a claim for civil conspiracy.

Buyers' motion to dismiss Count II is granted.

## B.     Personal Jurisdiction

Buyers seek to dismiss all claims as to Blue Star, Wechsler, Dubbioso, and Oshinsky for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2). This decision only addresses personal jurisdiction arguments as to Oshinsky.[93]

---

[91] *Agspring*, at *17.

[92] *SportTechie*, at *11.

[93] This decision has already determined that the Seller Complaint fails to state a claim against Blue Star, Wechsler, and Dubbioso. Technically, however, questions of personal jurisdiction precede questions concerning the legal sufficiency of a claim, such that this court should not reach the Rule 12(b)(6) arguments without first determining whether the court may exercise jurisdiction over the defendants. Accordingly, Blue Star, Wechsler, and Dubbioso should submit a letter confirming that they intend to withdraw their motion to dismiss for lack of personal jurisdiction.

31

"When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[94] In ruling on a 12(b)(2) motion, this court may "consider the pleadings, affidavits, and any discovery of record."[95] "If, as here, no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction and 'the record is construed in the light most favorable to the plaintiff.'"[96]

Delaware courts resolve questions of jurisdiction using a two-step analysis. The first step requires determining "that service of process is authorized by statute,"[97] and the second requires finding that the defendant had certain minimum contacts with Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice."[98]

Sellers argue that this court has personal jurisdiction over Oshinsky under two theories—the conspiracy theory of jurisdiction and Delaware's long-arm statute. This decision addresses those arguments in that order.

---

[94] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (citing *Werner v. Mill Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch. 2003)).

[95] *Ryan*, 935 A.2d at 265 (citing *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003)).

[96] *Ryan*, 935 A.2d at 265 (first citing *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996); and then quoting *Cornerstone*, 2003 WL 1787959, at *3).

[97] *Ryan*, 935 A.2d at 265.

[98] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)).

The Delaware Supreme Court established the five elements of the conspiracy theory of jurisdiction in *Istituto Bancario Italiano SpA v. Hunter Engineering Co.*,[99] which "functionally encompass both prongs of the jurisdictional test."[100]  "The first three . . . elements address the statutory prong . . . .  The fourth and fifth . . . elements address the constitutional prong . . . ."[101]  The first element of that test requires the court to find that a civil conspiracy existed.  This decision has already determined that no civil conspiracy exists here.  Accordingly, the first element of conspiracy theory jurisdiction is not met, and Sellers fail to establish personal jurisdiction over Oshinsky on that basis.

Delaware's long-arm statute provides jurisdiction over a nonresident "who in person or through an agent . . . [t]ransacts any business or performs any character of work or service in the State . . . [or] [c]auses tortious injury in the State by an act or omission in this State."[102]  "[A] single transaction is sufficient to confer jurisdiction where the claim is based on that transaction."[103]  "Under the plain language of the Long-Arm Statute, forum-directed activity can be accomplished 'through an agent.'"[104]

---

[99] 449 A.2d 210, 225 (Del. 1982).

[100] *Virtus Cap. L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at \*12 (Del. Ch. Feb. 11, 2015).

[101] *Id.*

[102] 10 *Del. C.* § 3104(c)(1) & (3).

[103] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000).

[104] *Virtus Cap.*, 2015 WL 580553, at \*11 (quoting 10 *Del. C.* § 3104(c)).

Sellers contend that "Oshinsky took specific fraudulent actions, which are the subject of this lawsuit, in order to effectuate the [Purchase Agreement]."[105] Further, Sellers allege that "execution of the [Purchase Agreement] resulted in, among other things, the formation of" SwervePay Holdings, OSC Parent, and SwervePay Acquisition, all of which are Delaware entities.[106]

This argument fails because the Seller Complaint does not allege that Oshinsky played any role in forming SwervePay Holdings, OSC Parent, or SwervePay Acquisition. In fact, the Seller Complaint attached board minutes confirming that SwervePay, LLC was responsible for creating SwervePay Acquisition and that OSC Holdings was responsible for creating SwervePay Holdings and OSC Parent.[107] Where an individual such as Oshinsky had no role in forming a Delaware entity, either directly or indirectly, or did not otherwise "participate[] in the formation [of a Delaware entity] in a meaningful fashion," this court will not find an adequate basis for asserting personal jurisdiction over that individual.[108]

---

[105] Sellers' Answering Br. at 51.

[106] *Id.*

[107] *See* Seller Compl., Ex. 24 at 9–10 (explaining that "SwervePay, LLC forms a new Delaware limited liability company, SwervePay Acquisition, LLC [SwervePay Acquisition]" and "OSC Investment, L.P. [OSC Holdings] forms: a. OSC Payments, Inc. [Parent], a Delaware corporation; and b. SwervePay Holdings, LLC, [SwervePay Holdings] a Delaware limited liability company").

[108] *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *7 (Del. Ch. Sept. 2, 2008) (holding that personal jurisdiction under Delaware's long-arm statute is not proper when plaintiff fails to allege that the defendant "formed [the Delaware entity]," actively "participated in the formation in a meaningful fashion," or "participated in selecting Delaware as the state of . . . formation").

34

Consequently, Sellers have failed to plead the existence of personal jurisdiction over Oshinsky under either the long-arm statute or the conspiracy theory of jurisdiction. Buyers' motion to dismiss all claims against Oshinsky is granted based on a lack of personal jurisdiction.

### C.     Buyers' Motion To Dismiss The Seller Complaint Conclusion

In conclusion, Buyers' motion to dismiss is granted in part except as to the Fraud Claims in Counts I and IV through VIII against New Mountain.

## III.    FACTUAL BACKGROUND TO MOTION TO DISMISS THE BUYER COMPLAINT

The facts are drawn from the Buyer Complaint and the documents it incorporates by reference.[109]

### A.     SwervePay Struggles As A Standalone Business.

SwervePay was a "consistently unprofitable payment facilitator" who "spent years unsuccessfully trying to find a buyer."[110]  At a February 2020 meeting of SwervePay's board of directors, Adams stated that he was concerned with the company's ability to survive independently or attract a "major go to market partner[]."[111]  Adams explained that market partners were unwilling to partner with SwervePay because they had "concern[s] with the size and stability of the Company."[112]  The minutes of this meeting state that

---

[109] Dkt. 51, Am. Verified Compl. For Fraudulent Inducement and Breach of Contract ("Buyer Compl.").

[110] *Id.* ¶¶ 42–43.

[111] *Id.* ¶¶ 6, 45.

[112] *Id.* ¶ 46.

absent the Buyers' acquisition, the company "would need to immediately start looking for additional cash," and the company was considering a down round of funding.[113]

While SwervePay struggled as a standalone business, the company possessed valuable payment facilitator technology. That valuable technology was at risk, however. Adams stated during a February 2020 meeting of the SwervePay board of directors that "the Company's technological lead in the [payment facilitator] space was dwindling, as other better funded competitors had taken a page from the Company's playbook and competition was heating up, with the window closing on the technological edge held by the Company."[114] Sellers failed to disclose this information as part of the acquisition transaction.

### B. Sellers' Pre-Acquisition Representations Of SwervePay's Features, Functions, And Customer Pipeline

Purchase Agreement negotiations began in Fall of 2019.[115] Buyers engaged Blue Star to assist with diligence, and Sellers populated an electronic data room.

Several key features and functions of SwervePay were identified in the SwervePay Product Matrix (the "Product Matrix") that Sellers uploaded to the data room on December 23, 2019, under a folder entitled "Product and Technology."[116] The Product Matrix contained a list of 65 features and functions of SwervePay's technology. Three were

---

[113] *Id.* ¶ 47.

[114] *Id.* ¶ 50.

[115] *Id.* ¶ 53.

[116] *Id.* ¶ 62.

"critical features that were integral to the future success of [SwervePay]: (i) 'automated or rule based' underwriting and onboarding processes; (ii) 'RESTful API [Application Programming Interface] access'; and (iii) 'text and email-based payment requests' and 'receipts.'"[117]

Sellers also made direct representations to Blue Star about SwervePay's features. On November 5, 2019, Adams emailed Blue Star stating that SwervePay had "[a]djacent technology built modularly to the platform that allows for advanced communication (text-to-pay, agent keyword text-to-collect)" and "[i]nstant onboarding."[118] Blue Star memorialized these representations in a PowerPoint presentation and categorized each functionality as "currently available," "partially available," or "currently unavailable."[119] Blue Star asked Adams to review this presentation for accuracy, and later that day, Adams emailed back an annotated version of the presentation. Adams's annotated version did not advise Blue Star that any of the identified functionalities were either unavailable or lacked the capabilities described in the presentation.[120] Specifically, Adams's annotated version indicated that "Automated, instant onboarding," "Underwriting (automated & rules-based)," and "Text-to-pay (including request and receipt)" were "Currently Available."[121]

---

[117] *Id.* ¶ 65.

[118] *Id.* ¶¶ 66–67.

[119] *Id.* ¶ 68.

[120] *Id.* ¶¶ 69–70.

[121] *Id.* ¶ 73.

On December 19, 2019, Adams and Hamilton presented a PowerPoint entitled "SwervePay Technology Overview" (the "Technology Overview") to Buyers' representatives and then uploaded the Technology Overview to the data room.[122] The Technology Overview confirmed that "Instant onboarding of SwervePay-issued Sub-Merchant Accounts," "Automatic and Manual Underwriting Processes," "Text receipts," "Payment requests," "Text-to-Pay," and "REST API" were features of SwervePay's technology.[123]

Sellers also made representations to Buyers as to SwervePay's existing customer relationships and customer pipeline. On December 23, 2019, Sellers' representatives stated to Buyers' representatives that there was a potential customer, PointClickCare Corp., who could provide $24.6 million in annual recurring revenue. Schedule 3.22 of the Purchase Agreement listed SwervePay's top ten "Material Customers," and Section 3.22 of the Purchase Agreement stated that there has not been "any material adverse change in the business relationship of the Company with any Material Customer."[124]

### C. Buyers Discover Post-Closing That Representations As To SwervePay's Features, Functions, And Customer Pipeline Were False.

Post-closing, Buyers integrated SwervePay's technology into Ontario's software platform and began offering it to customers. This process revealed that some of Sellers' representations about features, functionality, and customers were materially false.

---

[122] *Id.* ¶ 74.

[123] *Id.* ¶ 76.

[124] *Id.* ¶ 82.

As to automated onboarding and underwriting, Ontario employees were required to "manually assist the customer throughout the underwriting and enrollment process," necessitating days of back and forth with the customer.[125] Further, the SwervePay product could not meaningfully "evaluate the risk associated with potential customers," in contravention to Sellers' claims that the technology had "automated or rule based" underwriting.[126]

As to RESTful API access, which is a feature that allows customers and third parties to integrate SwervePay functionality into their existing applications, the feature was "materially incomplete and non-functional."[127] Instead, "virtually every API had to be custom-built for each potentially [] interested ISV [Independent Software Vendor], a labor-intensive and time-consuming process."[128] As an example, if an ISV wanted to add an additional information field, such as a location, the ISV would have to reach out to Ontario and have one of its employees manually set up a new location information field.[129] Adams confirmed in an email one month after closing that "SwervePay lacked the promised API functionality" and that creating a new integration system could take three to six months.[130]

---

[125] *Id.* ¶ 102.

[126] *Id.* ¶ 104.

[127] *Id.* ¶ 109.

[128] *Id.*

[129] *Id.* ¶ 112.

[130] *Id.* ¶ 116.

As to text and email-based payment requests and receipts, the feature was not functional and was not "capable of being marketed to customers."[131] The text and email messaging feature "(i) could not be used effectively with large provider systems, (ii) lacked basic and standard capabilities necessary to operate a payments business, and (iii) provided such a limited and poor user-experience, it was not a meaningfully operational feature of the SwervePay product."[132] In a post-closing email on March 18, 2020, Hamilton described the "Payment by Text and Email" system as a "Phase 2" project where "some effort [was] needed to enable live client implementation."[133]

As to additional features and functionality promised in the Product Matrix, Sellers claimed that 65 "services/solutions" existed in the SwervePay product.[134] Post-closing, "approximately one-third of the promised features either did not actually exist or were materially incomplete and non-functional as of the time of the Transaction."[135] These missing or incomplete functions include: (i) merchant account provisioning with "full control over settlement" and "raw interchange data access";[136] (ii) "customer-facing payment interfaces";[137] (iii) "customer/patient portal" with "standalone payments, card-on-

---

[131] *Id.* ¶ 121.

[132] *Id.* ¶ 125.

[133] *Id.* ¶ 127.

[134] *Id.* ¶ 129.

[135] *Id.*

[136] *Id.* ¶¶ 130–31.

[137] *Id.* ¶ 133.

file management," and "self-service and provider-driven signup";[138] (iv) "message/queue monitoring and alerting";[139] (v) "granular data change notification via SQS messaging for data consumers";[140] (vi) "dynamic per-client configuration options";[141] (vii) "automatic deployment generation";[142] (viii) "hosted payment forms";[143] and (ix) "in system, granular user/permission management."[144]

As to the customer pipeline representation, the $24.6 million annual recurring revenue opportunity with PointClickCare failed to materialize. Sellers "misrepresented the state of their discussions with PointClickCare," "there was no opportunity with PointClickCare that was already coming to fruition" as of December 23, 2019, and "none of the additional revenue that [Sellers] represented was already beginning to materialize ever did."[145]

### D. Sellers Fail To Disclose Adverse Changes In Relationships With Material Customers.

As to existing customer relationships, Sellers represented in Section 3.22 of the Purchase Agreement that there was no "'material adverse change in the business relationship of the Company with any' of its Material Customers disclosed in Schedule

---

[138] *Id.* ¶ 135.

[139] *Id.* ¶ 137.

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] *Id.* ¶¶ 144–45.

3.22 from January 1, 2021 through the Closing Date."[146]  Following the acquisition, however, "SwervePay's top three Material Customers all either reduced their business with SwervePay or terminated their relationship."[147]

SwervePay's relationships with two of the top three Material Customers, ProScan and ARStrat, were "deteriorating."[148]  In fact, those accounts were identified in an October 2019 SwervePay presentation as "the Company's two 'largest accounts with decreasing revenues.'"[149]  SwervePay's revenue from ProScan, its largest customer, decreased materially since January 2019; revenue from its third largest customer, ARStrat, decreased by nearly 40% since 2019.  Additionally, the second largest Material Customer, The CORE Institute, terminated its relationship with SwervePay soon after the Purchase Agreement was signed.  Buyers filed a claim for indemnification as to these alleged material adverse changes on February 6, 2021, which was within the survival period of the Purchase Agreement.

### E.    The Buyer Complaint

Buyers filed an amended version of the Buyer Complaint on November 4, 2021.[150]

The Buyer Complaint alleges two counts against the Sellers.  Count I is for fraudulent inducement against all Sellers based on representations related to SwervePay's

---

[146] *Id.* ¶ 149.

[147] *Id.* ¶ 152.

[148] *Id.* ¶ 154.

[149] *Id.* ¶153.

[150] Dkt. 51.

features, functions, and customer pipeline. Count II is for breach of contract against Sellers for breaching Section 3.22 of the Purchase Agreement based on alleged material adverse changes in the business relationship with any Material Customers.

The Sellers moved to dismiss all counts based on Court of Chancery Rules 12(b)(6) and 9(b). The motion was fully briefed on March 28, 2022, and the court heard oral argument on this motion contemporaneously with argument on the Buyers' motion to dismiss the Seller Complaint on April 14, 2022.[151]

## IV. LEGAL ANALYSIS OF SELLERS' MOTION TO DISMISS THE BUYER COMPLAINT

This analysis first addresses Sellers' motion to dismiss the fraud claim in Count I and then turns to Sellers' motion to dismiss the breach of contract claim in Count II. The standard governing motions to dismiss for failure to state a claim is set forth above.[152]

### A. The Fraud Claim

In Count I, Buyers claim that Sellers made fraudulent misrepresentations that induced Buyers to enter into the Purchase Agreement. The elements of a claim for fraud are set forth above.[153] In moving to dismiss, Sellers group these allegedly fraudulent statements into three categories: customer pipeline statements; key product technologies and features; and "additional" technologies and functionalities. As to each of the three categories, Sellers argue that Buyers fail to state a claim for fraudulent inducement because

---

[151] Dkt. 56 ("Sellers' Opening Br."); Dkt. 59 ("Buyers' Answering Br."); Dkt. 61 ("Sellers' Reply Br.").

[152] *See* Section II.A *supra*.

[153] *See* Section II.A.1 *supra*.

they fail to adequately allege that any statement was false. Buyers further allege that Sellers fail to adequately allege the elements of reliance or damages.

### 1. Falsity of Statements Regarding The Customer Pipeline

Buyers challenge two different customer pipeline statements by Sellers: (a) representations regarding SwervePay's "Material Customers" and (b) representations regarding a business opportunity with PointClickCare.

#### a. Material Customers

Sellers advance arguments as to dismissal of claims based on SwervePay's "Material Customers," and Buyers failed to address this argument in either its answering brief or during oral argument. "A party's failure to address in its responsive brief an opposing party's asserted grounds for dismissal, coupled with its failure to cure that omission at the corresponding oral argument, can lead to the Court's deeming the underlying issue waived."[154] Because Buyers did not respond to Sellers' arguments for dismissal of claims based on the Material Customer representations in Count 1, those claims are dismissed.

#### b. PointClickCare

Buyers allege that Sellers falsely stated, during a December 23, 2019 diligence call, that a $24.6 million annual recurring revenue opportunity with PointClickCare was already coming to fruition.

Sellers advance two arguments in support of dismissal.

---

[154] *VTB Bank v. Navitron Projects Corp.*, 2014 WL 1691250, at *4 (Del. Ch. Apr. 28, 2014) (citing *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999)).

Sellers first argue that the statement was a forward-looking opinion that cannot give rise to a fraud claim. It is generally true that forward-looking opinions cannot support claims of fraud,[155] but Sellers' first argument does not work on these facts. Although Sellers portray the December 23, 2019 statement as a "future prediction that the potential PointClickCare opportunity would bear fruit,"[156] as alleged, the statement was not forward-looking. Rather, it was a statement that a revenue opportunity through PointClickCare was "beginning to come to fruition" as of December 23, 2019.[157] Such a statement is sufficient to afford Buyers the inference that Sellers intended to communicate that a deal with PointClickCare was beginning to generate revenue, i.e., the "fruit" of the deal.

Sellers next argue that Buyers have failed to allege "that the statement was known to be 'false when made' or that [Sellers] 'lacked a good faith belief in [its] truth.'"[158] This argument fails as well. Knowledge of falsity is an exception to Court of Chancery Rule

---

[155] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 209 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (holding that statements such as "the company believed that the [] acquisition would generate good results" does not support a claim of fraud because "[t]hey are simply statements of expectation or opinion about the future of the company and the hoped for results of business strategies. Such opinions and predictions are generally not actionable under Delaware law"); *see also Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001) (holding that "alleged statement that the 'current financial posture justified the projections for future sales' is not actionable because it was an expression of opinion that the projections were adequately supported"); *In re Student Fin. Corp.*, 2004 WL 609329, at *3 (D. Del. Mar. 23, 2004) ("Under Delaware law, [o]pinions and statements as to probable future results are not generally fraudulent even though they relate to material matters." (internal quotation marks omitted)).

[156] Sellers' Opening Br. at 27.

[157] Buyer Compl. ¶ 80.

[158] Sellers' Opening Br. at 28.

45

9(b). Although "the circumstances constituting fraud . . . shall be stated with particularity . . . knowledge . . . may be averred generally."[159]  Knowledge can be adequately alleged where well-pleaded facts make it "reasonably . . . inferred that this 'something' was knowable and that the defendant was in a position to know it."[160]  Buyers have met this standard.  Whether the PointClickCare deal was beginning to bear fruit was a "knowable" fact by Sellers.  At the pleading stage, making all inferences in favor of the Buyers, it is reasonably conceivable that Sellers either knew or should have known that the PointClickCare statement was false.

Sellers' motion to dismiss Count I as to the PointClickCare allegations is denied.

### 2. Falsity of Statements Regarding Key Product Technologies And Features

Buyers challenge Sellers' statements concerning three key product technologies and features: (a) automated underwriting and onboarding; (b) RESTful API access; and (c) text and email-based payments and receipts.

### a. Automated Underwriting And Onboarding

Buyers allege that Sellers made three false statements as to SwervePay's automated underwriting and onboarding capabilities.  First, in the Product Matrix uploaded to the data room on December 23, 2019, Sellers represented that "the SwervePay product had 'automated or rule based' underwriting and onboarding processes and that '[a]utomated,

---

[159] Ct. Ch. R. 9(b).

[160] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 147 (Del. Ch. 2004) (quoting *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998)).

instant onboarding' was 'currently available.'"[161] Second, in the Technology Overview presentation Adams made to Buyers on December 19, 2019, SwervePay represented that "'[i]nstant onboarding' and '[a]utomatic . . . [u]nderwriting [p]rocesses' were features of SwervePay's technology."[162] Third, in a November 5, 2019 email to Blue Star, Adams promised "'[i]nstant onboarding requiring less data and overhead in underwriting requirements.'"[163]

Buyers allege that these statements were false because Ontario employees were required to "manually assist the customer throughout the underwriting and enrollment process" and because the product could not meaningfully "evaluate the risk associated with potential customers."[164] Buyers allege that this was contrary to Sellers' claims that the technology had "automated or rule based" underwriting.[165]

Sellers advance three arguments in support of dismissal.

Sellers first argue that the representation of SwervePay's technology was for "Automatic _and Manual_ Underwriting Processes."[166] They say that Buyers do not allege that Sellers represented that SwervePay featured "underwriting and onboarding '_without the manual assistance of a SwervePay employee_.'"[167] Even crediting Sellers' strained

---

[161] Buyer Compl. ¶ 100.

[162] _Id._

[163] _Id._

[164] _Id._ ¶ 102.

[165] _Id._ ¶ 104.

[166] Sellers' Opening Br. at 39 (emphasis in original).

[167] _Id._ (emphasis added).

reading of this representation—that SwervePay promised only a combination of automated and manual underwriting and onboarding as opposed to fully automated onboarding—this argument fails based on Buyers' well-pled complaint. The Buyer Complaint alleges that SwervePay's technology, as delivered, required employees to "manually assist the customer throughout the underwriting and enrollment process."[168] This allegation gives rise to a reasonable inference that the product lacked any automation. Buyers have therefore adequately alleged that the representations concerning automation were false.

Sellers next argue that this fraud claim is negated by an extrinsic document, "The Liberty Diligence Report."[169] This argument fails because the referenced document is neither attached to nor referenced in the Buyer Complaint. Regardless of its contents, the court cannot consider it at this procedural posture.[170]

Sellers last argue that Buyers' "statement that the underwriting process did not 'meaningfully' evaluate risk" is too vague and subjective to support a fraud claim under Rule 9(b).[171] Specifically, Sellers argue that "[w]hat is a 'meaningful' or 'not meaningful' evaluation of risk is inherently a subjective opinion, and such claims cannot support fraud."[172] This argument also fails because the allegation does not stand in isolation.

---

[168] Buyer Compl. ¶ 102.

[169] Sellers' Opening Br. at 39–40.

[170] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995) ("Generally, matters outside the pleadings should not be considered in ruling on a motion to dismiss.").

[171] Sellers' Opening Br. at 40.

[172] *Id.*

Taken as a whole, the Buyer Complaint pleads facts from which the court can infer that the SwervePay technology lacked automated underwriting as promised.[173]

Sellers' motion to dismiss Count I as to the automated underwriting and onboarding feature is denied.

### b. RESTful API Access Feature

Buyers allege that Sellers twice represented that "SwervePay technology included RESTful API [] access" in both the Product Matrix and the Technology Overview.[174] Buyers contend, however, that SwervePay effectively lacked the API access feature because certain key features were missing. For example, Buyers argue that the lack of automatic integration with independent software vendors and the inability to automatically add an information field were missing features that rendered the delivered API access nonfunctioning.

Sellers move for dismissal as to the RESTful API access feature because they did not expressly represent in pre-acquisition materials that certain features, such as automatic integration or automatic addition of information fields, were available and functioning.[175] This view is myopic because Buyers argue that key features were missing from the delivered product such that it effectively lacked *any* API access. Sellers concede that SwervePay was represented in pre-acquisition materials to have "Restful API access" as

---

[173] *See* Buyer Compl. ¶¶ 100–05.

[174] *Id.* ¶ 106.

[175] Sellers' Opening Br. at 34.

an "[i]ntegration option."[176]  As a result, the only remaining question is whether the lack of automatic integration or ability to automatically add information fields renders the API access effectively non-existent.  Such a question is a factually rife determination that is not suitable for disposition at the pleading stage.[177]

Sellers' motion to dismiss Buyers' claims as to the RESTful API access feature allegation in Count I is denied.

### c.  Text And Email-Based Payments And Receipts

As to text and email-based payments and receipts, Buyers argue that the feature was not "meaningfully operational" because it "(i) could not be used effectively with large provider systems, (ii) lacked basic and standard capabilities necessary to operate a payment business, and (iii) provided such a limited and poor user-experience."[178]  Sellers again argue that there were no misrepresentations as to the specific features that Buyers claim rendered the text and email-based payment systems effectively inoperable.[179]  This argument fails for the same reason it did above: once Buyers have alleged that Sellers represented that a specific feature or function was part of the SwervePay product, the question of whether deficiencies with that feature or function render it effectively inoperable are not suitable for resolution on the limited record of a motion to dismiss.

---

[176] *Id.* at 33.

[177] *See Weiss v. Swanson*, 948 A.2d 433, 447 (Del. Ch. 2008) (noting that similar questions of fact were "unsuitable for determination on a motion to dismiss").

[178] Buyer Compl. ¶ 125.

[179] Sellers' Reply Br. at 18.

In their opening brief, Sellers concede that text and email-based payments were promised in pre-acquisition communications.[180] Buyers have adequately pled, with the particularity required by Rule 9(b), that certain features and functions that were necessary to the operation of the text and email-based payment option were missing. The determination of whether those missing features and functions render the text and email-based payment option effectively inoperable is a factual determination that the court cannot make based on the limited record. Accordingly, Sellers' motion to dismiss Buyers' claims at to the text and email-based payments feature in Count I is denied.

### 3. Falsity Of Statements Regarding Additional Technologies And Functionalities

Buyers argue that ten "additional" features and functions were missing from the SwervePay product.[181] Sellers correctly point out, however, that six of the ten missing features were pled in conclusory fashion.[182] As an example of Buyers' conclusory pleadings, under several features the Buyer Complaint simply states that the features were "partial or incomplete."[183] This court is not obligated to accept such conclusory

---

[180] *See* Sellers' Opening Br. at 42 (citing Buyer Compl. ¶¶ 119, 121–24) (stating that "'[T]ext and email-based payment requests' are 'Services / Solutions Provided'").

[181] Buyers' Answering Br. at 30–31.

[182] *See* Seller' Reply Br. at 28–29; *see also* Buyers' Answering Br. at 30–31.

[183] Buyer Compl. ¶¶ 131, 137; *see also* Buyers' Answering Br. at 30–31.

allegations,[184] and such conclusory pleadings fail to meet the particularity requirement of Rule 9(b).[185]

The four remaining features are: (i) "customer-facing payment interfaces," (ii) "standalone payments," (iii) "card-on-file management," and (iv) "merchant account provisions."[186] Buyers claim that SwervePay was represented to have a "customer/patient payment portal," which was represented pre-acquisition to have "standalone payments," "card-on-file management," and "self-service and provider-driven signup."[187] Buyers allege, however, that as of the closing date those features were so limited in functionality that "it was functionally equivalent to the feature not existing at all."[188] Buyers allege the same for the "[m]erchant account provisioning," which included full control over "Settlement (Instructional-based funding)" and "Raw interchange data access."[189]

Sellers repeat the argument that the lack of these specified features does not make the pre-acquisition statements misrepresentations. For the same reasons this argument failed above, it fails here. Whether the absence of "card-on-file management" or full

---

[184] *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

[185] *Largo Legacy Gp., LLC v. Charles*, 2021 WL 2692426, at *20 (Del. Ch. June 30, 2021) (dismissing fraud claim because "'conclusory allegations of a 'scheme' are insufficient, and do not excuse the [p]laintiffs from their burden of properly stating a claim upon which relief may be granted") (quoting *Thermopylae Cap. P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *15 (Del. Ch. Jan. 29, 2016)).

[186] Sellers' Opening Br. at 45–47.

[187] Buyer Compl. ¶ 135.

[188] *Id.* ¶ 134.

[189] *Id.* ¶¶ 130, 132.

control over "raw interchange data access" renders the respective features effectively nonfunctional is a question of fact best resolved on a more fulsome record. By stating that specific features were promised but missing from the final product, the Buyers have carried the burden imposed by Rules 12(b)(6) and 9(b), and the claims for the four additional technologies survive dismissal.[190]

Accordingly, Sellers' motion to dismiss the "additional features" allegations in Count I is granted except as to customer-facing payment interfaces, standalone payments, card-on-file management, and merchant account provisioning.[191]

### 4. Justifiable Reliance

Sellers argue that Buyers fail to allege that they justifiably relied on the misrepresentations.

"Making a false statement is not a strict liability offense."[192] In order to plead a claim of fraud, the defendant must have had "the intent to induce the plaintiff to act or refrain from acting," and the plaintiff must in fact have acted or not acted "in justifiable reliance on the representation."[193]

Setting aside Sellers' arguments related to the Liberty Report, which is extrinsic to the Buyer Complaint and will not be considered based on the reasons stated above, Sellers'

---

[190] *See Kainos Evolve, Inc. v. InTouch Techs., Inc.*, 2019 WL 7373796, at *5 (Del. Ch. Dec. 31, 2019) (holding that descriptions of platform features that "were not fully functional" satisfied the time and place requirements for pleading a fraud claim).

[191] Sellers' Opening Br. at 45–47.

[192] *NACCO*, 997 A.2d at 29.

[193] *Id.* (citations omitted).

arguments boil down to claims that Buyers were "experience[d]" and "well-resourced" in the payment facilitator sphere.[194]  This argument runs contrary to the Buyer Complaint, however, which states that Buyers "were dependent on [Sellers'] written and oral representations concerning the systems' functionalities" because Buyers "had not operated a payment facilitator business prior to the Transaction and were not experts in payment facilitator technology and functionality."[195]

At the motion to dismiss stage, factual inferences are resolved in favor of the non-movants, i.e., the Buyers.  Further, this outcome is buttressed by the fact that questions of reliance are ill-suited for disposition at the motion to dismiss stage.[196]  This point—that a developed factual record is necessary to make the reliance determination—is made more poignant by Sellers' multiple attempts to introduce evidence neither attached to nor included in the Buyer Complaint.

Sellers' motion to dismiss Buyers' claims in Count I for failure to allege justifiable reliance is denied.

---

[194] Sellers' Reply Br. at 30.

[195] Buyer Compl. ¶¶ 92–93.

[196] *See S'holder Representative Servs. LLC v. Albertsons Cos., Inc.*, 2021 WL 2311455, at *11 (Del. Ch. June 7, 2021) ("[W]hether a party's reliance was reasonable is not generally suitable for resolution on a motion to dismiss."); *NACCO*, 997 A.2d at 32 (stating that "the line when [] reliance became unreasonable is difficult to draw and is not something I will address on a motion to dismiss"); *Flowshare, LLC v. GeoResults, Inc.*, 2018 WL 3599810, at *4 (Del. Super. July 25, 2018) (noting that "whether a party's reliance was reasonable is not generally suitable for resolution on a motion to dismiss").

### 5. Damages

Finally, Sellers argue that Buyers fail to plead damages with particularity. Sellers argue that the damages in the Buyer Complaint were "conclusory," "generic," and "speculative."[197] In their Reply Brief, however, Sellers retreat to a narrower version of this argument, contending that Buyers fail to adequately allege a claim for rescissory damages because Buyers delayed bringing this claim for nearly 18 months.[198]

Both arguments fail. As to the first argument, fraud claims under Rule 9(b) do not require damages to be pled with particularity; rather, the rule simply requires a plaintiff to plead causation with particularity.[199] As to the second argument, even assuming *arguendo* that rescissory damages are inappropriate here, Buyers also plead that they suffered damages in having to spend additional money and time on fixing the missing features and functionalities, which represent expectation damages distinct from the rescissory damages.[200] Having identified an independent basis for damages outside of rescissory damages, this decision need not address Sellers' second argument on this point.

Sellers' motion to dismiss Count I for failure to plead damages with particularity is denied.

---

[197] Sellers' Opening Br. at 59–60.

[198] Sellers' Reply Br. at 36.

[199] *See* Ct. Ch. R. 9(b); *see also Bamford v. Penfold, L.P.*, 2020 WL 967942, at *21 (Del. Ch. Feb. 28, 2020) (noting that "[e]ven when a plaintiff asserts a fraud claim, damages do not have to be pled with particularity. What has to be pled with particularity are 'the circumstances constituting fraud or mistake'").

[200] Buyer Compl. ¶¶ 105, 117, 128.

## B. The Breach Of Contract Claim

The elements of a claim for breach of contract and interpretive principles of contract interpretation are set forth above.[201]

In Count II, Buyers argue that, according to Section 3.22 of the Purchase Agreement, Sellers represented that there had not been "any material adverse change in the business relationship of the Company with any Material Customer" and that Sellers did not receive any notice that any of its top ten customers "threatened to cease doing business with the Company Group or has adversely changed or has threatened to adversely change, in any material respect . . . other terms of its business with the Company Group."[202]  Buyers argue that Sellers breached Section 3.22 because "there were material adverse changes in the business relationship . . . with at least two of the ten Material Customers" before the Purchase Agreement was effective.[203]

Sellers advance two arguments in support of dismissal.

They first argue that Count II is time-barred under the 15-month contractual limitations period in Section 6.01 of the Purchase Agreement.  They next contend that Count II fails to state a claim for three reasons.

### 1. Count II Is Not Time-Barred.

Section 6.01 of the Purchase Agreement states:

> Survival of Representations, Warranties and Covenants.  Each of the representations and warranties contained in this

---

[201] *See* Section II.A.2 *supra*.

[202] Buyer Compl. ¶ 182.

[203] *Id.* ¶ 183.

Agreement or in any certificate delivered with respect thereto in connection herewith, and all indemnification obligations pursuant to Section 6.02(a) and Section 6.03(a) with respect thereto, shall survive the Closing and remain in full force and effect until fifteen (15) months after the Closing Date (the "General Survival Period");

. . .

Any claim for indemnification brought on or prior to the expiration of the applicable survival period set forth in this Section 6.01 shall survive indefinitely until fully and finally resolved in accordance with the terms, conditions and procedures set forth in this ARTICLE VI.[204]

Section 6.04 of the Purchase Agreement states:

Exclusive Remedy. From and after the Closing, each Party acknowledges and agrees that, except as provided in Section 2.07 or Section 6.06 or Actions for fraud, intentional misrepresentation or intentional breach, his, her or its sole and exclusive remedy with respect to any and all claims relating to the subject matter of this Agreement and transactions contemplated hereby (other than equitable remedies pursuant to Section 7.02) shall be pursuant to the indemnification set forth in this ARTICLE VI. In furtherance of the foregoing, each Party hereby waives any provision of applicable Law to the extent that it would limit or restrict the agreement contained in this Section 6.04.[205]

Sellers argue that Section 6.01 applies a 15-month contractual limitations period to their representations and warranties under the Purchase Agreement, including Section 3.22.[206] This means that the contractual limitations period expired on May 24, 2021, while Buyers did not file the original Buyer Complaint until over two months later. Sellers

---

[204] Buyer Compl., Ex. A ("Purchase Agreement") art. IV, § 6.01.

[205] Purchase Agreement art. IV, § 6.04.

[206] Sellers' Opening Br. at 14.

further allege that none of the contractual exceptions apply, meaning that Buyers' breach of contract claim is contractually barred under this provision.

In response, Buyers argue that Section 6.01 does not apply to Count II because the Purchase Agreement contains a carve-out for "intentional breach" in Section 6.04, which excludes those claims from the indemnification provisions set out in Section 6.01.

In support of this position, Buyers rely on *ENI Holdings, LLC v. KBR Group Holdings, LLC*.[207] In *ENI*, Vice Chancellor Glasscock considered whether a similar provision to the parties' purchase agreement precluded filing fraud claims based on non-fundamental representations outside of the contractual limitations period.[208] The movants relied on the fact that the agreement contained a survival provision that did "not contain an express exclusion for claims based on fraud" while providing express carve-outs for fraud elsewhere. As a result, the movants contended that the parties intended that fraud claims be subject to the contractual limitations period in the survival provision.[209] The non-movants argued that carve-outs for fraud elsewhere in the agreement, particularly a carve-

[207] *ENI Hldgs., LLC v. KBR Grp. Hldgs., LLC*, 2013 WL 6186326 (Del. Ch. Nov. 27, 2013); *see also SPay, Inc. v. Stack Media Inc.*, 2021 WL 6053869, at *7 (Del. Ch. Dec. 21, 2021) (applying the holding of *ENI* and concluding that "the contractual survival period set forth in Section 7.1 of the [amended purchase agreement] does not apply to claims for fraud, including contractual fraud, because Section 7.4 of the [amended purchase agreement], an exclusive remedy provision, expressly "carves out fraud claims from the indemnification regime"").

[208] *ENI*, 2013 WL 6186326, at *15.

[209] *Id.*

out providing that indemnification is not the "sole and exclusive remedy" for fraud claims, evidenced that fraud claims were *not* intended to be subject to the survival provision.[210]

The Vice Chancellor noted that "by providing that the indemnification provisions do not constitute the 'sole and exclusive remedy' for fraud, [the agreement] contemplates that at least some actions grounded in fraud can be brought outside the [agreement's] indemnification provisions, and thus, can be timely brought within the statutory—rather than contractual—limitations period."[211] The Vice Chancellor held that fraud claims were not barred by the limitations period because the agreement was "ambiguous at best," and that since non-movants proffered a reasonable interpretation, any ambiguity should be resolve in their favor.[212]

The holding of *ENI* matches the facts at issue here, where Section 6.04 contemplates that indemnification is not the exclusive remedy for intentional breach. Specifically, the Purchase Agreement envisions, via Section 6.04, that some intentional breach actions can be brought outside the indemnification provision of Section 6.01, as was the case in *ENI*. Accordingly, Buyers' breach of contract claim in Count II is not subject to the contractual limitations period and is therefore timely.

In search of a contrary outcome, Sellers first argue that Section 6.04 is "purely a *remedies* provision" and thus "under the Purchase Agreement's plain text, Section 6.04

---

[210] *Id.*

[211] *Id.* at *16.

[212] *Id.*

does not exempt such causes of action from Section 6.01's limitations period."[213]  This argument fails because the court in *ENI* expressly held that a remedies provision with a carve-out for certain claims can introduce ambiguity into whether those claims are within the purview of an indemnification provision.

Sellers next argue that *ENI*'s holding flows from Delaware's "venerable public policy against fraud" and that there is "no similar public policy concern with intentional breaches."[214]  This is, again, expressly contradicted by the *ENI* court, which grounded its decision in contractual ambiguity and sidestepped the public policy arguments as to fraud altogether.[215]  The contract, and not public policy, carves out an exemption for intentional breach in this case.

Having found that Count II is not time-barred under the contractual limitations period of Section 6.01 of the Purchase Agreement, the court turns to Sellers' alternative argument that Count II fails to adequately plead a breach of contract claim.

### 2.  Count II States A Claim.

Section 3.22 of the Purchase Agreement states:

> Customers and Vendors.  Schedule 3.22 contains a true, complete and correct list in order of (a) the top ten (10) customers (based on gross sales) (collectively, the "Material Customers") and (b) the top five (5) vendors (based on gross expenditures) of the Business (collectively, the "Material

---

[213] Sellers' Reply Br. at 10 (emphasis in original).

[214] *Id.*

[215] *See ENI*, 2013 WL 6186326, at *16 (noting that because the decision was resolved based on contractual interpretation grounds, "I need not reach KBR's argument that claims sounding in fraud cannot be subject to a limitations period shorter than that provided by statute, as a matter of public policy").

60

Vendors"), in each case, as of the twelve (12)-month period ended on the Reference Balance Sheet Date, along with the amounts invoiced to or by each such Material Customer or Material Vendor, respectively, during such period. *Since the Lookback Date, there has not been (i) any material adverse change in the business relationship of the Company with any Material Customer or Material Vendor or (ii) any change in any material term of the arrangements with any such Material Customer or Material Vendor.* Since the Lookback Date, no member of the Company Group has received any customer complaint concerning its products and services, other than complaints in the Ordinary Course of Business that, individually or in the aggerate, are not material. No member of the Company Group has received any written notification, or, to the Knowledge of the Company, oral notice, that any of the Material Customers or Material Vendors has, or, to the Company's Knowledge, has threatened to cease doing business with the Company Group or has adversely changed or has threatened to adversely change, in any material respect, the pricing or other terms of its business with the Company Group.[216]

Based on the language emphasized above, Sellers argue that Buyers' claims "concern neither the identities of SwervePay's customers, nor that SwervePay hid any change in the material terms of the arrangements between SwervePay and its customers, nor hid the loss (or even the threatened loss) of any material customer."[217] Instead, since Buyers' claims only concern declining revenue from certain customers. They further argue that the Buyer Complaint contains only conclusory allegations regarding the purported deterioration of business relationships. They finally contend that "[e]ven assuming that a mere decline in revenue could somehow constitute a breach of Section 3.22," the facts in

---

[216] Purchase Agreement § 3.22 (underline emphasis in original; italics emphasis added).

[217] Sellers' Opening Br. at 5 (emphasis omitted).

Buyers' own complaint refute the contention that there was a material decline in revenue, showing instead mere "fluctuations of revenue growth and decline."[218]

These arguments ignore the procedural posture. Materiality is a factual rife issue. A material loss of *revenue* supports an inference of a "material adverse change" in a customer *relationship*.[219] Although the allegations concerning the circumstances surrounding the alleged "rupture in the relationship between SwervePay and [a top customer]" could be more developed, Buyers adequately allege that it occurred.[220] And although declining revenue standing alone may not support the contractual claim at issue, it would be unwise at this stage to require a tremendous amount of additional granularity concerning duration and other supporting factors.[221]

Accordingly, the Buyers' motion to dismiss Count II is denied. Count II states a claim (albeit just barely).

---

[218] Sellers' Opening Br. at 5.

[219] Buyers' Answering Br. at 58 ("Indeed, revenue losses are the quintessential measure of whether there has been a 'material adverse change' with a customer.").

[220] Buyer Compl. ¶ 157; *see also* Buyers' Answering Br. at 59 ("To survive Sellers' motion, Buyers need only plead a reasonably conceivable set of circumstances susceptible of proof, with the benefit of all reasonable inferences. The Complaint satisfies this threshold by alleging that two of SwervePay's ten largest customers suffered material revenue losses during the Lookback Period, and that another terminated its relationship with SwervePay shortly after Closing.").

[221] Buyers' Answering Br. at 60 (internal quotation marks omitted). I also acknowledge Buyers' secondary arguments—that materiality is a question of fact ill-suited for resolution at the pleading stage and that the MIPCA contains a "materiality scrape." Neither sway the decision herein. The Court need not dive into a factual "materiality" analysis; the terms of the Purchase Agreement and the face of the Buyer Complaint illustrate the fatal flaws in the contract claim. And the materiality scrape is immaterial here, as, again, the court's analysis does not hinge on a "materiality" analysis. *See* Purchase Agreement § 6.08(e).

**C.    Sellers' Motion To Dismiss The Buyer Complaint Conclusion**

In conclusion as to the Buyer Complaint, Sellers' motion to dismiss Count I of the Buyer Complaint is denied except as to (i) the PointClickCare allegations, (ii) the key product technologies and features allegations, and (iii) the "additional features" allegations concerning customer-facing payment interfaces, standalone payments, card-on-file management, and merchant account provisioning.  Sellers' motion to dismiss Count II is denied.

**V.    CONCLUSION**

In summary, the respective motions to dismiss the Seller and Buyer Complaints are granted except as to Buyer's motion to dismiss the Fraud Claims in Counts I and IV through VIII against New Mountain in the Seller Complaint and the Sellers' motion to dismiss Count II and the (i) the PointClickCare allegations, (ii) the key product technologies and features allegations, and (ii) the "additional features" allegations concerning customer-facing payment interfaces, standalone payments, card-on-file management, and merchant account provisioning in Count I of the Buyer Complaint.